UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LM BUSINESS ASSOCIATES, INC., THE
PAYROLL STORE, INC., NORTHEAST
STAFFING GROUP, INC., TRIPLE COUNTY
AGENCY, INC., EXECUTIVE RESOURCES,
INC., PRO TO CALL, INC., and 1649
MONROE ASSOCIATES, LLC,

                            Plaintiffs,                No. 04-CV-6142 CJS

     -vs-

                                              DECISION AND ORDER

ROBERT DAVIS,

                          Defendant.
_____

APPEARANCES

For Plaintiffs:               Leo G. Finucane, Esq.
                               Finucane and Hartzell
                               6 North Main Street
                               Pittsford, New York 14534

For Defendant:             J. Richard Benitez, Esq.
                               Assistant Attorney General of Counsel
                               NYS Office of the Attorney General
                               144 Exchange Boulevard, Suite 200
                               Rochester, New York 14614

INTRODUCTION

      This is an action pursuant to 42 U.S.C. § 1983 alleging a "class-of-one" equal

protection claim.  Now before the Court is Defendant's motion [#34] for summary

judgment.  For the reasons that follow, the application is granted and this action is

dismissed.

BACKGROUND

      Unless otherwise noted, the following are the undisputed facts of this case,

viewed in the light most favorable to Plaintiffs.  Plaintiffs are related corporations which, at all relevant times, provided payroll, temporary staffing, employee leasing and insurance services to employers.  Plaintiffs were owned primarily by Mark Boerman ("Boerman") and David Mann ("Mann").[1]  The New York State Insurance Fund ("NYSIF") is a not-for-profit agency of the State of New York, which provides both worker's compensation insurance benefits and disability insurance benefits to employers. Plaintiffs purchased Worker's Compensation Insurance from NYSIF at various times.  At all relevant times, defendant Robert Davis ("Defendant") was a Senior Investigator with NYSIF's Division of Confidential Investigations ("DCI"), whose purpose was to investigate insurance fraud.

Prior to April 2001, NYSIF learned of possible fraudulent activity by Plaintiffs and/or Boerman and Mann, involving Workers Compensation Insurance.  DCI subsequently began investigating Plaintiffs, in cooperation with the Internal Revenue Service ("IRS"), the New York State Police, and local law enforcement.  On or about April 4, 2001, Investigator Thomas Hand ("Hand"), an Investigator with the New York State Police, submitted a Search Warrant Application to Wayne County Court Judge, Honorable Stephen Sirkin, seeking permission to search Plaintiffs' offices and seize various items including computers.  In a supporting affidavit, Hand indicated, in relevant part:

> That your affiant has been involved in an investigation into apparently fraudulent activities involving some or all of the business enterprise know as "The Payroll Store," "Payforce," "Upstate Contractors," "American Staff Management," "Executive Resources," "Triple-County Agency," "Wayne

---

[1]Donna Boerman also was an owner of The Payroll Store. (Boerman Dep. 13)

Excavating," "LM Business Associates," "Northeastern Staffing Group,"
"Pro-to-Call," "Pay-Plus Service" and other enterprises, yet unknown.  As
well as the principals of these enterprises, including Mark Boerman
["Boerman"] and David Mann ["Mann"], and others yet unknown.

That members of the New York State Insurance Fund, including Senior
Investigator Robert Davis, Division of Confidential Investigations , have met
with your affiant regarding the fraudulent practices involving Workers
Compensation Insurance that some or all of the business enterprises and
the principals named above may be or have been, involved in.

(Def. Appendix to Rule 56.1 Stmt.)  Specifically, Hand indicated that one of the

companies listed above, American Staff Management ("ASM"), was believed to have

defrauded the NYSIF with regard to the purchase of Worker's Compensation Insurance,

by incorrectly stating that it employed only clerical and sales staff, when it actually

employed "workers [who] were involved in various laborer or physical work activities, not

related to sales or clerical work, off the premises of the actual or alleged employer." (*Id*.)

Hand further indicated that "'Payforce' and all or some of the related enterprises [except

"Triple County Agency"]" "loaned" employees to other employers, as temporary

employees, and charged the employers for Workers Compensation Insurance coverage,

but purchased no such insurance. (*Id*.)   Hand requested, as part of the warrant

application, that IRS Special Agents, NYSIF Investigators, and  Investigators with the

New York State Workers Compensation Board be allowed to assist the New York State

Police in its search of the premises.  Judge Sirkin signed the search warrant on April 4,

2001. (Def. Appendix to Rule 56.1 Stmt.)

On April 5, 2001, members of the New York State Police executed the search

warrant, assisted by local law enforcement, IRS agents, and members of DCI, including

Defendant.  Pursuant to the warrant, the New York State Police seized numerous boxes

3

of documents and all of Plaintiffs' computers.  Following the seizure, the computers were kept in the custody of the New York State Police and/or the IRS, though they were physically stored at DCI's offices in Rochester, New York.

During the execution of the warrant on April 5th, Boerman advised one of the individuals involved in the raid that Plaintiffs needed the computers in order to continue doing business.  Boerman indicates that the individual told him he could have the computers back in about a week.  Boerman, though, denies having any such conversation with Defendant that day. (Boerman Dep. 75)[2] However, approximately one week later, Boerman called Defendant, because "someone" had told him that Defendant was "the one to contact about the equipment." (Boerman Dep. 76).  Boerman indicates that during a subsequent telephone call, Defendant made "vague promises" that Boerman would receive the computers back. (Boerman Dep. 34)  Specifically, Boerman indicates that Defendant responded with, "We're working on it." (Boerman Dep. 79) Subsequently, Boerman's attorney, Donald Adair ("Adair"), left a phone message with an employee of NYSIF, indicating that he was seeking the return of the computers, and asked that the message be relayed to Defendant.  On April 11, 2001, Defendant returned the call and left a message for Adair, indicating "that the Internal Revenue Service [was] 'ghosting' [the computers]; and . . . that the computers will probably be

---

[2]Although it is irrelevant to the outcome of this motion, Plaintiffs indicate, in their Memo of law, that Boerman spoke with Davis about the return of the computers on the day the warrant was executed, citing page 30 of Boerman's deposition.  However, the discussion to which Boerman was referring on page 30 of his deposition was a later telephone conversation with Davis.  Boerman specifically indicated at his deposition that he did not speak with Davis regarding the computers on April 5, 2001. (Boerman Dep. 75). Investigator Robert Fuller indicated at his deposition that Boerman spoke to Defendant on April 5, 2001 about the return of the computers, but did not recall what Defendant said. (Fuller Dep. 76-77). Accordingly, there is no evidence that Defendant made any representations to Boerman about the computers at the time the computers were seized.

available next Tuesday or Wednesday," which would have meant April 17 or April 18, 2001. (Adair Aff. ¶ 14).  Later that day, Adair spoke directly with Defendant and related "the problems that would result [to Plaintiffs' business] in getting payroll out if the computers were not returned by Tuesday, April 17th." (Id. at ¶ 15).  Specifically, Adair indicated that Plaintiffs would go out business if they did not have the computers back by April 17.  Defendant and Adair then "discussed the possibility of getting some of the computers back by [April 17] even if all of them could not be returned." (Id.)  Adair subsequently faxed Defendant a list of the computers that were most important to Plaintiffs' payroll processing.  During that same conversation, Defendant told Adair that he had tried to call Boerman, but that Boerman was "playing games" with him, which he was "not going to tolerate." (Id. at ¶ 15)  Defendant further indicated that the case involving Boerman was "bad," and that the investigators "really got him [Boerman]." (Id.)  On April 12, 2001, Adair again spoke by telephone with Defendant, who indicated that he "would call Mr. Boerman when they [the computers] were ready." (Id. at ¶ 18).  Plaintiffs went out of business a short time later, purportedly due to the fact that they had not received the computers.

    Subsequent to the search and seizure, both Boerman and Mann were prosecuted.  On March 24, 2003, Boerman pled guilty to Offering a False Instrument for Filing in the First Degree, and received a sentence of probation.  Specifically, Boerman acknowledged that on August 14, 2000, he submitted a C-2 form that falsely stated that an individual named Francis Miller was employed by ASM and covered by Worker's Compensation Insurance.   On or about October 22, 2004, Mann pled guilty to Filing a False Payroll Tax Return, in violation of 26 U.S.C. § 7206(1).  Mann was sentenced to

5

eight months imprisonment and ordered to pay over $1.3 million in restitution to the IRS.

Several months after Boerman's conviction, he was notified by an employee of the Office of the New York State Attorney General that he could retrieve the computers. (Boerman Dep. 46)   Boerman obtained most of the computers from the IRS, although he also received some directly from Defendant. (Boerman Dep. 82-83, 87)

Plaintiffs commenced this action on April 2, 2004.  Plaintiffs thereafter sought leave to amend the complaint, and pursuant to a Decision and Order [#11] filed on November 17, 2004, the Court permitted Plaintiffs to file an Amended Complaint.  The Amended Complaint contains a single cause of action alleging a "class-of-one" equal protection violation[3], and, in pertinent part, states:

> 69. The Defendants and NYSIF singled out the Plaintiffs for investigation and prosecution for the purpose of eliminating the Plaintiffs as competitors.
>
> 70. The Defendants and NYSIF conducted the search and seizure and subsequent investigation in an invidiously discriminatory manner.
>
> 71. The Plaintiffs were members of a class protected by the Equal Protection Clause of the Fourteenth Amendment to the Constitution.
>
> 72. The Defendants and NYSIF, intentionally treated the Plaintiffs differently from other similarly situated businesses.
>
> 73. There was no rational basis for the arbitrary manner in which the Defendants treated the Plaintiffs differently from other similarly situated businesses.
>
> 74. The Defendants engaged in conduct violating the Plaintiffs' right to equal protection under the law by intentionally misrepresenting when the computers would be returned; by stringing the Plaintiffs along as to when the computers would be returned; failing to return the computers, in bad

---

[3]In dismissing Plaintiffs' remaining claims, the Court specifically noted that Plaintiffs had failed to state a claim under the 14th Amendment Due Process Clause or Fourth Amendment, or any claim for equitable estoppel. (Decision and Order [#11]).

faith; retaining possession of the computers after the Plaintiffs requested their return; retaining possession of the computers beyond a reasonable period of time necessary to inspect the computers and/or after the Defendants said they would return the computers, all done with no rational basis, arbitrarily and capriciously.

75. The above described acts of the Defendants were motivated by an intent to inhibit or punish the Plaintiff's exercise of constitutional rights.

76. The above described acts of the Defendants were motivated by malice.

77. The above described acts of the Defendants were motivated by a bad faith intent to injure the Plaintiffs.

78. As a result of the Defendants' unconstitutional actions, the Plaintiffs were deprived of property and liberty.

(Amended Complaint [#8]).

In this regard, Plaintiffs allege that NYSIF, acting through Defendant, was motivated solely by a desire to "destroy the Plaintiffs' businesses," because Plaintiffs were "engaged in business involving providing worker's compensation insurance coverage to their customers in a manner that placed them in direct economic competition with NYSIF." (Amended Complaint ¶¶ 18, 21). More specifically, as set forth in the Amended Complaint Plaintiffs' theory is that

Defendants and NYSIF regarded the Plaintiffs as a competitive threat to the business of NYSIF. The Defendants knew that the Plaintiffs had thousands of active business customers who utilized the Plaintiffs' payroll and employee leasing services. [Plaintiffs were] able to recommend (to its employee leasing and payroll customers) worker's compensation insurance coverage through insurance carriers other than NYSIF at rates competitive with those of NYSIF and in direct competition with NYSIF.
                                                        ***
Defendants used the NYSIF investigation as a pretext to seize and possess critical operating equipment and data from the Plaintiffs in a concerted and intentional effort to destroy the business of the Plaintiffs.

(Id. at ¶ ¶ 53-55, 58) (Paragraph numbers omitted).[4]

On March 19, 2007, Defendant filed the subject summary judgment motion [#34], contending that Plaintiff's equal protection claim lacks merit, or in the alternative, that he is entitled to judgment based on qualified immunity.  In that regard, Defendant contends that he personally neither prosecuted Plaintiffs nor seized their computers.  Additionally, Defendant maintains that he did not discriminate against Plaintiffs with regard to the return of the computers, since the computers were not under his control. (*See*, Def. Memo at 3) ("According to the judicial search warrant, law enforcement was solely authorized to seize/possess evidence . . . .")

Plaintiffs filed opposing papers, supported by affidavits from Boerman and Adair, documentary exhibits, and  the deposition testimony of various individuals connected with NYSIF and DCI, including Defendant.  Notably, Plaintiffs now contend that Defendant discriminated against them as part of a personal vendetta against Boerman. As to this contention, Plaintiffs note that Defendant had previously investigated alleged fraud by Boerman and his father, but had concluded that any prosecution would be time-barred.  As a result, Plaintiffs believe, Defendant targeted them in the subject case by: 1) deciding to pursue a criminal investigation instead of a civil action; 2) unnecessarily obtaining a search warrant to seize the computers; and 3) misleading them into believing that the computers would be returned, and then retaining the computers without any justification.  Plaintiffs contend that they were similarly situated with all other individuals

---

[4]Plaintiffs' contention that NYSIF wanted to destroy their business so that they would not steer their customers to other worker's comp insurance providers is implausible, at best.  Plaintiffs do not allege that they ever recommended that their customers use insurance providers other than NYSIF, nor do Plaintiffs explain why, if that were true, they themselves were purchasing their Worker's Comp insurance through NYSIF.

and businesses against whom NYSIF pursued fraud charges in 2001, none of whom were the subject of search warrants. Alternatively, Plaintiffs argue that, even if they were not similarly situated with these other entities, they can still prevail on a "class-of-one" equal protection claim merely by showing that Defendant acted with malice.

On September 27, 2007, counsel for the parties appeared before the undersigned for oral argument. The Court has considered the parties' submissions along with the entire record in this matter, as well as the arguments of counsel.

## DISCUSSION

### *Summary Judgment Standard*

The summary judgment standard is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517

U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

*42 U.S.C. § 1983*

Pursuant to 42 U.S.C. § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York*, 985 F.2d 94,

98 (2d Cir. 1993).  To be liable for money damages under 42 U.S.C. § 1983, a

defendant must have been personally involved in the alleged constitutional deprivation.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  Personal involvement by a

supervisory official may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or
> appeal, failed to remedy the wrong, (3) the defendant created a policy or
> custom under which unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the defendant was grossly
> negligent in supervising subordinates who committed the wrongful acts, or
> (5) the defendant exhibited deliberate indifference to the rights of inmates
> by failing to act on information indicating that unconstitutional acts were
> occurring.

*Id.*(citations omitted).  A plaintiff may not rely upon the doctrine of *respondeat superior* to

establish supervisory liability under 42 U.S.C. § 1983. *Monell v. New York City*

*Department of Social Services*, 436 U.S. 658, 691-95 (1978).

> *14th Amendment Equal Protection Claim*

The legal principles concerning a "class-of-one" equal protection claim are clear:

> The equal protection clause directs state actors to treat similarly situated
> people alike.  An equal protection claim requires purposeful discrimination,
> directed at an identifiable or suspect class.  It is possible for [a plaintiff] to
> allege a  'class of one,' where the plaintiff alleges that he has been
> intentionally treated differently from others similarly situated and that there
> is no rational basis for the difference in treatment.  Under the "class of one"
> theory of equal protection, a plaintiff is required to show either that there
> was no rational basis for the unequal treatment received or that the denial
> of the application was motivated by animus.

*Foy v. City of New York*, No. 03 Civ. 7318(HB), 2004 WL 2033074 at *3 (S.D.N.Y. Sep.

10, 2004) (citations and internal quotation marks omitted).  With regard to demonstrating

such disparate treatment, the Second Circuit Court of Appeals has stated

> that class-of-one plaintiffs must show an extremely high degree of similarity

11

between themselves and the persons to whom they compare themselves.
This showing is more stringent than that used at the summary judgment
stage in the employment discrimination context.  This is because the
existence of persons in similar circumstances who received more favorable
treatment than the plaintiff in a class-of-one case is offered to provide an
inference that the plaintiff was intentionally singled out for reasons that so
lack any reasonable nexus with a legitimate governmental policy that an
improper purpose-whether personal or otherwise-is all but certain.
Accordingly, to succeed on a class-of-one claim, a plaintiff must establish
that (i) no rational person could regard the circumstances of the plaintiff to
differ from those of a comparator to a degree that would justify the
differential treatment on the basis of a legitimate government policy; and
(ii) the similarity in circumstances and difference in treatment are sufficient
to exclude the possibility that the defendants acted on the basis of a
mistake.

Generally, whether parties are similarly situated is a fact-intensive inquiry.
A court may grant summary judgment in a defendant's favor on the basis
of lack of similarity of situation, however, where no reasonable jury could
find that the persons to whom the plaintiff compares itself are similarly
situated.

*Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citations and internal

quotation marks omitted).

Applying these principles of law, the Court will first address Plaintiffs' alternative

argument, noted above, that they can prevail on a "class-of-one" equal protection claim

merely by showing that Defendant acted with malice.[5]  In support, Plaintiffs cite two

cases: *DeMuria v. Hawkes*, 328 F.3d 704 (2d Cir. 2003) and *Harlen Assocs. v Village of*

*Mineola*, 273 F.3d 494 (2d Cir. 2001).  However, the Court finds that neither case

supports Plaintiffs' position.  Consequently, Plaintiffs may not defeat Defendant's motion

without, *inter alia*, producing evidence that they were treated differently than others

---

[5]Plaintiffs' Memo of Law at 21 ("Even if the party subject to unequal treatment in a 'class of one'
claim can not establish similarity between it and other comparably situated parties, an Equal Protection
Clause violation can also be established by demonstrating animus, ill will or malice on the part of the
individual acting under color of law.")

12

similarly situated.

Moreover, on the issue as to whether they were treated differently from others similarly situated, the Court finds that Plaintiffs have failed to demonstrate the existence of triable issues of fact.  Although Plaintiffs contend that they were unfairly singled out, they have not shown that they were similarly situated with the 98 other individuals or businesses whom NYSIF referred for prosecution in 2001.  We know nothing about these others, except that they purchased insurance from NYSIF and were suspected of committing fraud.

Further, even assuming that Plaintiffs had shown that they were similarly situated, they have not shown that Defendant treated them differently.  Plaintiffs' first claim in this regard is that they were singled out for differential treatment because NYSIF referred the matter for criminal prosecution, instead of suing for money damages in a civil action. However, Plaintiffs have provided no information concerning specific instances in which similarly situated entities, suspected of committing fraud, were pursued in civil actions.

Nor, in any event, have Plaintiffs shown that Defendant was personally involved in such a decision.  Defendant denies that he was. (Davis Dep. 34-36)  Nevertheless, Plaintiffs contend that Defendant "must have"made the decision, arguing that: 1) Laurence LaPointe, Director of DCI, indicated that such a decision would have been made by either Defendant or his supervisor, Stanley Radwan ("Radwan"); 2) Radwan's deposition indicates that he did not have an "awareness of the criminal versus civil issues in the plaintiffs' case"[6]; and 3) therefore, Plaintiff must have made the decision.

---

[6]Pl. Memo of Law p. 9.

This argument fails in several regards.  First, LaPointe never indicated that either Defendant or Radwan made the decision.  Rather, LaPointe indicated that he "would expect" that the decision had been made on the "local level," but that he did not actually know who made the decision. (LaPointe Dep. 30-31).  Second, Radwan never indicated that he did not understand the difference between proceeding civilly and criminally.  Instead, Radwan indicated that DCI was *required* to pursue criminal charges, and that proceeding civilly was not an option. (Radwan Dep. 52) ("DCI . . . is mandated to investigate allegations of fraud, and if they exist, to take the evidence obtained to a prosecutor.  That's our mandate.  Our mandate has nothing to do with settling a potential criminal case civilly.")  Based upon this information, it would be sheer speculation to conclude that Defendant made the complained-of decision to refer the matter to law enforcement.  Moreover, the criminal prosecution was commenced by law enforcement, not Defendant.  Additionally, Plaintiffs argue that the decision to obtain a search warrant was discriminatory.[7]  But, again, that decision was made by the New York State Police, not Defendant.

Finally, Plaintiffs contend that the retention of the seized computers beyond April 17, 2001, was discriminatory.  Plaintiffs have not shown, however, that any similarly situated entity received back seized computers in less time.  Even assuming, *arguendo*, that Plaintiffs had come forward with such evidence, and further assuming that Defendant had the authority to release the computers to Plaintiffs, which the record does

---

[7]Purporting to rely on LaPointe's deposition testimony, Plaintiffs incorrectly posit that none of the 98 other entities were the subject of search warrants.  LaPointe merely testified that during his tenure, he could only recall two instances, including the instant case, in which NYSIF personnel were directly involved in the issuance and service of a search warrant.

14

not indicate,[8] Plaintiffs have not shown that the continued retention of the computers was without a rational basis or motivated by animus.  Clearly it would have been rational for law enforcement to retain the seized items during the pendency of the criminal cases against Boerman and Mann, or at least until such time as the process of "ghosting" the computers by the IRS was completed.  The record indicates that such "ghosting" was not completed as of April 17, 2001.  Furthermore, the fact that Defendant had previously investigated an allegation of fraud against Boerman and his father does not create a triable issue of fact as to whether Defendant was motivated by malice.

CONCLUSION

For all of the foregoing reasons, Defendant's motion [#34] for summary judgment is granted and this action is dismissed.

SO ORDERED.

Dated: Rochester, New York
       October 16, 2007

ENTER:


 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[8]At most, the record indicates that Defendant made representations from which one could infer that he had such authority.  However, the record contains no evidence that Defendant had actual authority to release the computers.

15